UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
JUDITH CROWE,                           )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        Civil Action No. 18-10490-JCB
                                        )
ANDREW SAUL, Commissioner,              )
Social Security Administration,[1]      )
                                        )
        Defendant.                      )
_____)

ORDER ON CROWE'S MOTION TO
REVERSE THE COMMISSIONER'S DECISION
AND COMMISSIONER'S MOTION TO AFFIRM
[Docket Nos. 23, 29]

August 29, 2019

Boal, M.J.

        This is an action for judicial review of a final decision by the Commissioner of the Social

Security Administration ("Commissioner") denying Judith Crowe's application for disability

insurance benefits ("DIB").  Crowe asserts that the Commissioner's decision denying her such

benefits – memorialized in an April 5, 2017 decision of an administrative law judge ("ALJ") – is

in error, Docket No. 23, and the Commissioner, in turn, has moved to affirm.  Docket No. 29.[2]

Crowe filed a reply brief.  Docket No. 31.  For the following reasons, this Court denies Crowe's

motion and grants the Commissioner's motion.

_____

[1] Andrew Saul, who is now the commissioner of the Social Security Administration ("SSA"), is
substituted for former Acting Commissioner Nancy A. Berryhill as the defendant in this suit
pursuant to Federal Rule of Civil Procedure 25(d).
[2] On July 5, 2018, the parties consented to the jurisdiction of a United States magistrate judge for
all purposes.  Docket No. 20.

I.      FACTS AND PROCEDURAL HISTORY

     A.      Procedural History

Crowe filed an application for DIB on February 19, 2015, alleging disability as of June 22, 2013 from a herniated disc, spinal stenosis, COPD and osteoarthritis.  (Administrative Record ("AR") 216-17).[3]  The application was denied initially (AR 130-41), and on reconsideration (AR 143-59).  On December 9, 2016, ALJ Paul W. Goodale held a hearing at which Crowe and vocational expert ("VE") Larry Takki appeared and testified.  (AR 40-107).

The ALJ issued a decision on April 5, 2017, finding that Crowe was not disabled from June 22, 2013, her alleged onset date, through March 31, 2016, her date last insured ("the relevant period").  (AR 12-31).  The Appeals Council denied Crowe's request for review on January 18, 2018, making the ALJ's decision the final decision of the Commissioner.  (AR 1-6).

Crowe filed this action on March 15, 2018.  Docket No. 1.

     B.      Background

Crowe was fifty-three years old on her date last insured.  (AR 130, 143).  She graduated from high school, is married and has three grown children.  (AR 51-53).

She reported past work as a secretary and cashier/stock clerk.  (AR 82-83).

     C.      Medical Evidence

On May 20, 2013, prior to her alleged onset date, Crowe visited Michael Marciello, M.D., of Dedham Physiatry, with complaints of ongoing neck pain and tenderness.  (AR 393-95).  Dr. Marciello assessed myofascial pain and cervical spondylosis and prescribed Vicodin and Klonopin.  (AR 394).  Crowe had been taking oxycodone at the time, but Dr. Marciello

---

[3] There is a prior unfavorable DIB decision, dated June 21, 2013, that Crowe does not challenge. See AR 108-25.

recommended that she cut back.  Id.  On May 28, 2013, Crowe visited Richard Gottlieb, M.D.,
her primary care physician, with complaints of neck pain and skin lesions.  (AR 65, 468).  Dr.
Gottlieb recommended that she consider physical therapy and take nonsteroidal anti-
inflammatory drugs for "significant arthritis of the neck."  Id.

On October 18, 2013, Crowe visited Dr. Gottlieb for a follow-up appointment, at which
she denied "any specific problems," except for some difficulty falling asleep.  (AR 466).
Examination of her neck and extremities revealed no abnormal findings.  Id.

In November 2013, Crowe visited Dr. Marciello for follow up regarding her neck and
parascapular pain.  (AR 392).  She was not as active due to pain from a slip and fall.  She also
reported that her back pain had "settled down," but she still had tenderness in the right side of
her lower back and numbness and tingling in her left arm and right shoulder.  Id.  Dr. Marciello
found that she had tenderness in her lower back, a nonfocal neurologic examination, tightness in
her pelvis and hamstrings, symmetric leg strength in both sides, a negative straight leg raise,
decreased strength in her right shoulder and normal sensation and reflexes in her hands.  Dr.
Marciello assessed lumbar strain/contusion of the sacroiliac joint, "[o]verall, stable," and chronic
cervical spondylosis with myofascial pain and intermittent radiculitis, also "[c]urrently stable."
Id.  He renewed Crowe's medications and "encouraged her to keep up with the stretching
exercises."  Id.

In February 2014, Crowe saw Dr. Marciello for increased neck pain and reported that she
had had "some falls and strain in the weather and continue[d] stresses."  (AR 390).  On
examination, she had some decreased neck movement; right-sided neck pain which caused
increased distress trying to turn to the right or side bend to the left; and tenderness and tightness
over the right base of the neck.  Id.  She had a nonfocal neurologic examination in the right arm,

"fine" reflexes and normal distal strength.  Id.  Dr. Marciello administered trigger point injections to Crowe's right cervical paraspinal muscles and continued her on oxycodone but indicated that she should try to reduce her opiod use.  Id.

In June 2014, Crowe visited Dr. Marciello and reported that she "ha[d] fallen about 3-4 weeks [prior] whe[n] she slipped being pulled forward by her dog."  (AR 388).  Dr. Marciello noted that, "[u]p to this fall, [Crowe] ha[d] been doing about the same," i.e., she had chronic daily discomfort around her neck and shoulders.  Id.  She reported continuing to use Klonopin and pain medications and following up with her primary doctor for weight and "general health." Id.  On examination, Crowe had some back tenderness, but showed "excellent" lumbar range of motion with extension and flexion, negative straight leg raise, intact sensation in her legs, and normal neck range of motion.  Dr. Marciello assessed Crowe as "stable" and recommended that she increase her stretching and exercise.  (AR 389).  Dr. Marciello noted that he "would like to see her be able to wean from her cigarettes and the oxycodone."  Id.

In August 2014, Crowe visited nurse Debra Brothers-Klezmer at Dedham Physiatry with complaints of neck and shoulder pain that radiated into her right arm.  (AR 421).  Crowe stated that she had "[n]o structured exercises," but reported taking care of her four-month-old granddaughter.  Id.  She explained that she had "fallen because [she] is clumsy" and took additional pain medications if needed.  (AR 422).  She reported that "[p]ain medications enable[d] more activity, and greater functioning."  Id.  She also stated that she decreased her dosage of medications when the pain subsided and took Aleve about once a week.  (AR 422).

In September 2014, Crowe visited physician's assistant Rebecca Howard at Dedham Physiatry for a follow up appointment regarding her neck and shoulder pain.  (AR 417).  Crowe reported that she had utilized and benefitted from trigger point injections in the past and

requested them again.  She also reported that she remained stable with the use of fifteen milligrams of oxycodone.  On examination, she had "slight limitation" of cervical range of motion, "acceptable" shoulder range of motion, and full strength ("5/5") in "all muscle groups of the upper extremities."  (AR 419).  Aside from "some mild diminished sensation in the fingertips," Crowe had "[n]o other areas of sensory change noted throughout [the] exam."  Id. Howard assessed cervical spondylosis and myofascial pain and recommended that Crowe continue stretching and range of motion exercises.  Howard administered trigger point injections which Crowe tolerated well.  Id.

In January 2015, Crowe saw Dr. Marciello for a follow up appointment regarding her "chronic cervical neck pain, myofascial pain, and medication management."  (AR 385).  She stated that one week prior to the visit, she had fallen backwards, aggravating her neck and posterior shoulder.  Id.  She reported that the pain depended on her "level of activity around the house" and extended out to her shoulder, causing general myofascial tenderness.  (AR 386).  On examination, her shoulder range of motion was "fine," although she had some restrictions reaching behind her as well as tenderness in her neck and shoulder.  Id.  Dr. Marciello assessed chronic cervical and parascapular myofascial pain that was exacerbated by her fall as well as underlying cervical spondylosis that was stable.  Id.  Dr. Marciello and Crowe discussed reducing her medications over time, but Dr. Marciello recommended that she "keep things the same and focus on increased resistive exercises."  Id.

On February 12, 2015, Crowe visited Dr. Gottlieb for an annual physical examination. (AR 453).  She denied headaches, arthritis pain, joint pain, muscle weakness or any neurologic symptoms.  (AR 454).  On examination, she was pleasant, alert, fully oriented and in no acute distress.  (AR 453-54).  She had normal reflexes, motor functioning, mobility and gait, and no

joint effusion or tenderness.  (AR 454).  Dr. Gottlieb found no musculoskeletal or neurologic

impairments, but did assess valve prolapse, emphysema and a cough.  (AR 454-55).

In March 2015, Crowe saw Brothers-Klezmer because shoveling had worsened the pain

in her right neck and shoulder.  (AR 411).  She described the pain as shooting, stabbing and

intermittent.  Id.  Brothers-Klezmer continued Crowe on her existing medication regimen.  Id.

In June 2015, Crowe visited Dr. Marciello with increased pain in her right shoulder,

especially with activities, such as reaching and trying to carry.  (AR 436).  She stated that she

had experienced a "fair amount of increased exertion trying to care for her house" and was trying

to keep up with routine stretching, without much success.  Id.  She denied any numbness or

tingling in the right arm but had persistent numbness in her left arm.  (AR 436-37).  She reported

taking her medications, including Klonopin regularly and fifteen milligrams of oxycodone four

times per day.  (AR 437).  On examination, she had "some" decreased neck movement with side

bending and rotation bilaterally and tightness and tenderness in the upper trapezius bilaterally.

Id.  She showed some signs of right shoulder impingement and some tenderness when externally

rotating the rotator cuff, but "no clear weakness."  Id.  Dr. Marciello assessed right shoulder

impingement and bursitis as well as cervical spondylosis with chronic myofascial pain.  Id.  He

encouraged Crowe to reduce her use of pain medications and "to try to maintain some level of

fitness," including strength training, for her shoulder.  Id.

On February 28, 2016, Crowe visited Dr. Marciello with increased pain and a loss of

range of motion in her right shoulder and parascapular area as a result of a shoveling incident.

(AR 473-74).  Dr. Marciello administered a trigger point injection in her right shoulder and

advised her to continue taking Klonopin and oxycodone.  (AR 474).

On March 23, 2016, Crowe visited Dr. Marciello for "chronic medication management"

for her neck and shoulder pain.  (AR 524).  She complained of limitations in her daily activities due to the pain and reported increased soreness that had lasted three weeks.  The February 2016 injection was "somewhat helpful" but had provided "no sustained benefit."  Id.  On examination, Dr. Marciello found that, although she had some soreness and impingement to the right shoulder, she was "a bit better than she was a couple weeks ago."  Id.  He assessed cervical spondylosis with myofascial pain, right shoulder impingement with associated muscle tightness, and medication dependence.  (AR 525).  He administered trigger point injections and continued Crowe on her medications.  Id.  Dr. Marciello indicated a potential need for a surgery referral.  Id.  He further noted that an MRI had been done in the past, but further imaging might be required.  Id.

During an April 11, 2016 physical therapy evaluation, Crowe reported that six months prior, her right shoulder pain had begun to worsen.  (AR 487).  She reported that this pain coupled with finger numbness and tingling made it difficult for her to wash her hair and dress herself.  An examination revealed positive Neer's, Coracoid Impingement and acromioclavicular signs.  The physical therapist indicated that Crowe would benefit from physical therapy to decrease her pain, increase her range of motion and strength, and improve activity tolerance, specifically, the ability to reach and perform grooming and dressing activities without restriction.  (AR 487-88).  Crowe attended five physical therapy sessions but discontinued treatment because she felt it was causing her more pain and resulting in less range of motion.  (AR 485-86, 516).

At an April 28, 2016 visit to Dedham Physiatry, Crowe reported that she was enjoying family time and walking daily for exercise but was frustrated that pain affected her ability to play with her grandchildren.  (AR 516-17).  She requested an MRI but had been told to complete physical therapy first.  (AR 516).

In July 2016, Crowe had an MRI examination of her right shoulder which showed calcific tendinitis supraspinatus at the footprint anterior fibers.  (AR 530-31).  The MRI showed no evidence of a rotator cuff or labral tear and no significant effusion or bursal fluid.  (AR 531).

   D. <u>Opinion Evidence</u>

In June 2015, at the initial stage of review, state agency physician R. Einhorn, M.D., opined that Crowe retained the capacity to lift and carry twenty pounds occasionally and ten pounds frequently; sit and stand/walk for six hours in an eight-hour workday; occasionally crawl; occasionally climb ramps, stairs, ladders, ropes or scaffolds; and frequently stoop, crouch, balance and kneel.  (AR 136-37).  In March 2016, at the reconsideration stage of review, state agency physician Jane McInerny, M.D., assessed a similar range of light work, with the additional limitation that Crowe was restricted to only occasional overhead reaching on the right side.  (AR 153-55).

In a medical source statement dated October 2016, Dr. Marciello noted that he had treated Crowe for cervical spondylosis, myofascial pain syndrome, chronic cervical radiculopathy and right rotator cuff impingement every three to four months for "many years." (AR 564).  He opined that she could occasionally lift less than ten pounds and rarely lift ten pounds.  (AR 565).  These limitations were based on the July 2016 "abnormal cervical MRI" that revealed "cervical spondylosis" and "calcific tendonitis with impingement" of the right shoulder. <u>Id.</u>

Dr. Marciello also opined that Crowe could sit for six hours in an eight-hour workday and stand/walk for a total of two hours.  <u>Id.</u>  She required the option to sit and stand at will.  <u>Id.</u> These limitations were based on examinations that showed reduced right shoulder range of motion, muscle spasm with tenderness in the right neck, weakness in the right shoulder and

chronic numbness of the left hand and arm.  Id.

Dr. Marciello opined further that Crowe could frequently climb stairs and ramps; rarely climb ladders and scaffolds; rarely balance; occasionally stoop; rarely rotate her head and neck; and never kneel, crouch or crawl.  (AR 566-67).  She could occasionally be exposed to environmental factors but never unprotected heights.  (AR 567).  As a result of her symptoms, impairments and/or treatment, moreover, he opined that Crowe would be off task more than twenty-five percent of the workday and absent more than four days per month.  (AR 564).  Dr. Marciello indicated that the symptoms and limitations that he described in the medical source statement first appeared "years ago."  Id.

E.    Hearing Testimony

At the hearing, Crowe testified that she was able to use the computer, make change and drive.  (AR 53).  She testified that she could go to the grocery store with her daughter and prepare simple meals but could not sweep or vacuum.  (AR 69-71).  She also testified that she was able to do small loads of laundry and unload silverware out of the dishwasher.  (AR 66, 70, 73).  She could go up and down stairs and did not rely on a cane or walker to ambulate.  (AR 69).

Crowe also testified that she was unable to work due to worsening pain in her neck and shoulder.  (AR 61-62).  She had difficulty reaching objects daily and described her pain as being around a "six" or "seven" out of ten unless she was on medication, in which case, the pain was around a "five" or "six."  (AR 63).  She also testified that she needed to constantly rest her shoulder against something and use her left hand to raise her right arm.  (AR 66-67, 74).  She stated that she could not lift a gallon of milk and her physician advised her to avoid lifting more than ten pounds, reaching overhead and extreme temperatures.  (AR 68, 78).

Vocational expert Larry Takki also testified at the hearing.  (AR 81-102).  The ALJ asked

the VE to assume a hypothetical individual with Crowe's age, education, and work experience who could perform duties at the light exertional level, with limitations to push/pull controls with the upper extremities, specifically frequently with the left upper extremity and rarely with the right upper extremity; frequently stoop, crouch and kneel; occasionally crawl, climb ramps and stairs; occasionally climb ladders, ropes or scaffolds; occasionally reach overhead with the right upper extremity; and frequently engage in other types of reaching, including lateral reaching with the right upper extremity.  (AR 84-85).  In addition, the individual would need to avoid concentrated exposure to workplace hazards, such as dangerous machinery and unprotected heights, and production rate or pace work; could have occasional interaction with the public, and superficial interaction with co-workers and supervisors.  (AR 85).  The vocational expert testified that this hypothetical individual could not perform Crowe's past relevant work, but could perform the jobs of office cleaner, occupational price marker and electronics assembler/subassembler.  (AR 86).

The ALJ then asked the VE to assume the same hypothetical individual, but with the added limitations of frequent, but not constant, handling with the right upper extremity; occasional rotation of the neck to look over the right shoulder; no rotation of the neck to look over the left shoulder; and no concentrated exposure to extreme cold and heat, or excessive or extreme vibration.  (AR 86-87).  The VE testified that the individual would still be able to perform the jobs he identified in the first hypothetical.  (AR 87).

II.    STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence.  See 42 U.S.C. §§ 405(g), 1383(c)(3).  Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion.  Rodriguez v. Sec'y of Health

& Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The Supreme Court has defined substantial evidence as "more than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts.  Rodriguez, 647 F.2d at 222; Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987).  A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  In the end, the court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming, modifying, or reversing the [Commissioner's] decision, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

III.    DISCUSSION

An individual is entitled to DIB benefits if, among other things, she has an insured status and, prior to its expiration, is disabled.  See 42 U.S.C. §§ 423(a)(1)(A), (E).  Crowe's last insured date was March 31, 2016.  (AR 225).  Accordingly, in order to be entitled to DIB benefits, she must demonstrate that she was disabled prior to March 31, 2016.  See Cruz Rivera v. Sec. of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986) ("Claimant is not entitled to disability benefits unless he can demonstrate that his disability existed prior to the expiration of his insured status.").

A.      Disability Standard And The Commissioner's Decision

The Social Security Act (the "Act") defines disability, in part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  See also 42 U.S.C. § 1382c(a)(3)(A) (similar).  An individual is considered disabled under the Act

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  See generally Bowen v. Yuckert, 482 U.S. 137, 146-49 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a severe impairment?  A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

> Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

> . . . .

> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

> Fifth, does the claimant's impairment prevent him from performing

other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

At step one, the ALJ found that Crowe had not engaged in substantial gainful activity during the period from her alleged onset date of June 22, 2013, through her date last insured of March 31, 2016.  (AR 17).  At step two, the ALJ found that Crowe had the following severe impairments through her date last insured: cervical degenerative disc disease; osteoarthritis; right shoulder dysfunction; myofascial pain syndrome; depressive disorder; and anxiety disorder.  (AR 18).  At step three, the ALJ found that Crowe's impairments did not meet or medically equal the criteria of any listing.  Id.  The ALJ then made the following finding about Crowe's residual functioning capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, [Crowe] had the residual functioning capacity to perform work at the LIGHT exertional level, as defined in 20 CFR 404.1567(b), but with the following limitations: [Crowe] would be limited to lifting and carrying twenty pounds occasionally and ten pounds frequently, and she could stand and sit for six hours each in an eight-hour workday.  [She] could frequently stoop, crouch, and kneel, could occasionally crawl, and occasionally climb stairs and ramps, and occasionally climb ladders, ropes or scaffold[s].  She could do occasional overhead reaching, frequent lateral reaching, and frequent handling all with the right upper extremity.  [Crowe] could only occasionally rotate her neck to look over right or left shoulder.  She could perform pushing and pulling to operate hand controls with the upper extremities frequently with the left upper extremity and occasionally with the right dominant upper extremity.  [Crowe] must avoid exposure to extreme temperatures, to excessive vibrations and to workplace hazards such as dangerous machinery and unprotected heights.  She could not do production rate or pace work.  [She] could have only occasional interaction with the public and superficial interaction with co-workers and supervisors.

(AR 20) (emphasis in original).  At step four, the ALJ found that Crowe could not perform her

past relevant work through the date last insured.  (AR 28).[4]  At step five, the ALJ found that,

through the date last insured, and considering Crowe's age, education, work experience and

residual functioning capacity, there were jobs that existed in significant numbers in the national

economy that she could perform.  (AR 29).

Crowe submitted a post-hearing memorandum of law and objections in direct response to

VE Takki's testimony.[5]  (AR 328-67).  She attached a supplemental opinion by vocational

rehabilitation counselor Paula Santagati as an exhibit.  (AR 365-66).  The ALJ addressed

Crowe's objections.  He stated that he had specifically inquired as to whether the VE's testimony

was consistent with the VE's personal and professional knowledge of the national labor market

and with information in the Dictionary of Occupational Titles ("DOT" or "DICOT") and

Selected Characteristics of Occupations ("SCO").  (AR 29-31).  The VE said that it was.  (AR

31).  The ALJ further found that "[n]o apparent conflicts" existed between the occupational

evidence that VE Takki provided and that which appears in the DOT and/or other relevant

sources of reliable vocational information.  Id.  Accordingly, the ALJ concluded that, based on

VE Takki's testimony, Crowe was not disabled at any time from June 22, 2013, the alleged onset

---

[4] At step four, the ALJ also found that on the date last insured, Crowe was fifty-three years old, "which is defined as an individual closely approaching advanced age."  (AR 28) (citing 20 CFR § 404.1563).

[5] Crowe objected to VE Takki's testimony on the following grounds: (1) the record did not reflect that VE Takki was qualified to provide an expert opinion on job incidence; (2) his job incidence testimony was based on untested and unreliable software (SkillTRAN's Job Browser Pro) and was therefore itself unreliable; (3) pursuant to market data, the jobs for which Crowe was deemed qualified are no longer performed at the unskilled level; (4) the jobs of marker, subassembler and housekeeping cleaner are not consistent with the hypothetical RFC that the ALJ provided; (5) the limitations set forth in the RFC were vague and ambiguous; (6) market data and the Santagati opinion reflect that the positions for which Crowe was deemed qualified require more than superficial interaction with co-workers and supervisors; and (7) a supplemental hearing should be held to address "these evidentiary and vocational inconsistencies."  (AR 328-67).

date, through March 31, 2016, the date last insured.  Id.

      B.      Crowe's Challenge To The ALJ's Decision

      Crowe argues that the ALJ failed to (1) give appropriate weight to her treating

physiatrist's opinion, resulting in an RFC that does not account for all her limitations and (2)

address her rebuttal evidence regarding the vocational expert's testimony.

      1.      The ALJ Did Not Err In Assigning Less Weight
                To The Opinion of Crowe's Treating Physiatrist

      Although not required to do so, see Arroyo v. Sec'y of Health & Human Servs., 932 F.2d

82, 89 (1st Cir. 1991), an ALJ generally gives "more weight to medical opinions from [the

claimant's] treating sources, since these sources are likely to be the medical professionals most

able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s). . . . "

20 C.F.R. § 404.1527(c)(2).  A treating source's opinion is entitled to controlling weight when it

is well supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with other substantial evidence in the case record.  Id.  However, "[t]he law in

this circuit does not require ALJs to give greater weight to the opinions of treating physicians."

Arroyo, 932 F.2d at 89 (citation omitted).  Indeed, "[i]t is within the Secretary's domain to give

greater weight to the testimony and reports of medical experts who are commissioned by the

Secretary."  Martin v. Colvin, No. 12-cv-12345-DPW, 2014 WL 309370, at *11 (D. Mass. Jan.

16, 2014) (citation omitted); see Social Security Ruling ("SSR") 96-6P, 1996 WL 374180 (July

2, 1996).

      When a treating source's opinion is not given controlling weight, the ALJ must determine

the amount of weight it should receive based on factors that include the length of the treatment

relationship, the nature and extent of the source's relationship with the applicant, whether the

source provided evidence in support of the opinion, whether the opinion is consistent with the

record as a whole, and whether the source is a specialist in the field.  Gagnon v. Astrue, No. 11-10481-PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012); 20 C.F.R. §§ 404.1527(c)(1)-(6).  Although it is desirable for a hearing officer to analyze each of these factors, a court will not remand the case so that another hearing officer may arrive at the same decision with more clarity.  Sanchez v. Colvin, 134 F. Supp. 3d 605, 612 (D. Mass. 2015) (citing Green v. Astrue, 588 F. Supp. 2d 147, 155 (D. Mass. 2008)).

An ALJ, however, is required to provide specific reasons for her determination of the weight given a treating source's opinion.  20 C.F.R. § 404.1527(c)(2).  This decision must be supported by the evidence in the case record and "must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).[6]  "Not only must the adjudicator's reasons be specific, they must also be supportable, and offer a rationale that could be accepted by a reasonable mind."  Hobart v. Astrue, No. 11-cv-151-PB, 2012 WL 832883, at *7 (D.N.H. Feb. 9, 2012) (citations omitted), report & recommendation adopted by, 2012 WL 832841 (D.N.H. Mar. 9, 2012).  As long as an ALJ provides "good reasons" for the weight given to a treating source opinion, however, an ALJ need not "slavishly discuss" every factor in his decision.  Pelletier v. Astrue, 09-10098-GAO, 2012 WL 892892, at *4 (D. Mass. Mar. 15, 2012) (citing Moore v. Astrue, No. 06-136, 2007 WL 2021919, at *6 (D. Me. July 11, 2007)) (alteration in original); see 20 C.F.R. § 404.1527(c)(2).  Even if an ALJ determines that a treating opinion is not entitled to controlling weight, a treating source's medical opinion is still

---

[6] The Commissioner recently rescinded SSR 96-2P.  SSR 96-2P, 2017 WL 3928305 (Mar. 27, 2017).  That rescission is effective for all claims filed on or after March 27, 2017.  Id.; see also Purdy v. Berryhill, 887 F.3d 7, 13 n.8 (1st Cir. 2018).  Crowe filed the instant application in February 2015.  (AR 216-17).  Therefore, the Court may consider SSR 96-2P.

entitled to deference.  SSR 96-2p, 1996 WL 374188, at *1.

In order to be entitled to DIB, Crowe must demonstrate that her impairment reached a

disabling level of severity prior to her date last insured, March 31, 2016.  Tsouvalas v. Berryhill,

No. 16-10903-RWZ, 2017 WL 3013247, at *3 (D. Mass. July 13, 2017) (citing Moret Rivera v.

Sec'y of Health & Human Servs., No. 93-1700, 1994 WL 107870, at *5 (1st Cir. Mar. 23,

1994)).  Medical evidence generated after the expiration of Crowe's insured status may be

considered for what light, if any, it sheds on the question of whether her impairments reached

disabling severity before that expiration.  See id. (citing Moret Rivera, 1994 WL 107870, at *5).

Here, the ALJ did not award controlling weight to Dr. Marciello's October 2016 opinion[7]

because it did not use "well-supported medically acceptable clinical diagnostic techniques" and

was "inconsistent with other substantial evidence in the record."  (AR 26-27).  The ALJ found

that, during the relevant time period, "Dr. Marciello's records reflect stable symptoms in the

context of generally unremarkable objective findings on exams."  Id.  The ALJ found that Dr.

Marciello's October 2016 findings were based in part on an MRI that was conducted after the

date last insured and that did "not include objective findings on MRI of the cervical spine during

the relevant time."  Id.  The ALJ also noted that Dr. Marciello's opinion expressly describes

symptoms and limitations that "first appeared years ago," but "fail[s] to include an explicit date

prior to the date last insured."  Id.  Indeed, the record evidence demonstrates that during the

relevant period, Crowe's conditions were largely stable or, at the very least, were aided by

medication, stretching and/or trigger point injections.  In particular, in November 2013, despite

subjective complaints of numbness and tingling, Dr. Marciello found that Crowe had a nonfocal

[7] The ALJ did find that Dr. Marciello (a physiatrist) was an "acceptable medical source" whose statements regarding Crowe's functional limitations "are considered to be from a treating source" and therefore "may be entitled to controlling weight."  (AR 26) (citing 20 C.F.R. § 404.1527(c)).

neurologic examination, normal sensation and reflexes in her hands and chronic cervical spondylosis that was stable. (AR 392). Substantial evidence supports the ALJ's assignment of non-controlling weight to Dr. Marciello's assessment. Accordingly, the ALJ did not err in discounting that opinion.[8]

There is no merit to Crowe's suggestion that the ALJ should have re-contacted Dr. Marciello to clarify any inconsistencies between his 2016 opinion and the record. See Docket No. 24 at 14. The Social Security regulations grant the ALJ the option of re-contacting a medical source if the evidence in the record is insufficient to determine whether the claimant is disabled or the ALJ is unable to resolve inconsistencies in the record. Arrington v. Colvin, 216 F. Supp. 3d 217, 242-43 (D. Mass. 2016) (citing 20 C.F.R. § 404.1520b). Alternatively, the ALJ may seek to resolve any inconsistency or insufficiency by requesting additional records, asking the claimant to undergo a consultative examination, or asking the claimant or others for information. Id. at 243 (citing 20 C.F.R. § 404.1520b). If, however, the ALJ can weigh the available evidence and reach a determination about a disability claim without the need to obtain additional information, he or she is not required to take further action. Id. (citing 20 C.F.R. § 404.1520b). The ALJ here was able to decide the matter without additional information and so, any alleged failure to seek such information does not amount to reversible error.

The ALJ assigned "great probative weight" to the assessments of state agency consultants Dr. Einhorn and Dr. McInerny because they were "supported by and consistent with the record

---

[8] Crowe also argues that the ALJ erred by discussing only some of the factors used to determine the weight given to Dr. Marciello's opinion. Docket No. 24 at 7-8. However, an ALJ need only provide "good reasons" for the weight given to a treating source's opinion. Green, 588 F. Supp. 2d at 154 (citing 20 C.F.R. § 404.1527(d)(2)). "Good reasons can be provided by discussing just one factor." Pelletier, 2012 WL 892892, at *4 (citing Green, 588 F. Supp. 2d at 155). Here, the ALJ satisfied this standard and therefore, has committed no error in this regard.

as a whole." (AR 26).[9]  Crowe maintains that this was error because the state agency consultants

did not examine her and did not review Dr. Marciello's opinion.  Docket No. 24 at 13-14.  "[T]he

amount of weight that can properly be given the conclusions of non-testifying, non-examining

physicians will vary with the circumstances, including the nature of the illness and the

information provided the expert."  Bourinot v. Colvin, 95 F. Supp. 3d 161, 179 (D. Mass. 2015)

(citing Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994)).  Here, there is no treating physician

opinion translating Crowe's ailments into functional limitations during the relevant period.

Accordingly, the ALJ properly relied on the opinions of the non-examining and non-treating

sources upon finding they were consistent with the medical record as a whole.  (AR 26); see

Duffy v. Colvin, 268 F. Supp. 3d 282, 289 (D. Mass. 2017).  This Court finds that the ALJ's

assignment of weight to the various medical opinions is supported by substantial evidence.

###### 2.  The ALJ Adequately Addressed And Rejected Crowe's Rebuttal Evidence At Step Five

At step five, the ALJ bears the burden of coming forward with evidence of specific jobs

in the national economy that the claimant can do based on her RFC, age, education, and work

experience.  Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).  The

ALJ may use testimony from a vocational expert to determine the number of jobs available in the

national and local economies to a hypothetical claimant with the RFC restrictions the ALJ finds.

Nichols v. Astrue, C.A. No. 10-11641-DPW, 2012 WL 474145, at *11 (D. Mass. Feb. 13, 2012).

At the hearing in this case, a vocational expert testified that through the date last insured,

a person with Crowe's age, education, work experience and RFC (which included a limitation to

"superficial" interaction with co-workers and supervisors) could perform the jobs of office

---

[9] The ALJ afforded even "greater weight" to Dr. McInerny's March 2016 assessment because it is based on a "more complete and updated record."  (AR 26).

cleaner, price marker and subassembler.  (AR 85-86).  After the hearing, Crowe submitted a

memorandum objecting to at least seven aspects of VE Takki's testimony, only one of which is

at issue here,[10] and attaching the Santagati opinion to rebut that testimony.  (AR 328-67).  The

Santagati opinion, which is dated October 1, 2015, is titled "Vocational Opinion Regarding the

Limitation of Occasional Interaction with Coworkers and Supervisors."[11]  It discusses the

training programs of entry level jobs at six companies for cashiers, dishwashers, factory workers,

cleaners and caretakers at assisted living facilities.  (AR 365-66).  The opinion contains no

specific reference to the facts and circumstances of this case.  It nevertheless concludes that a

limitation of "occasional interaction with coworkers and supervisors precludes all work as the

training and probationary period for any job would require more than occasional interaction with

coworkers and supervisors."  (AR 365).  Crowe maintains that the ALJ violated her procedural

due process rights by failing to address the Santagati opinion before crediting VE Takki's

testimony.  Docket Nos. 24 at 14-20; 31 at 1-5.

---

[10] Except for the sixth objection which is addressed at length herein, Crowe expressly states that
the remaining objections "are not asserted as error in this case."  Docket No. 24 at 18-19 n.7.
[11] Crowe argues that she could not have cross-examined VE Takki with the rebuttal evidence
without knowing the content of the VE's testimony ahead of time.  Docket No. 31 at 3 & n.2.
This argument would be more persuasive if the Santagati opinion was written after the VE's
testimony and commented on the facts in this case.  The Santagati opinion was authored more
than a year before VE Takki's December 9, 2016 testimony.  The Santagati opinion appears to be
a form affidavit that has been used in cases across the country with mixed success.  See, e.g.,
Jeffries v. Berryhill, No. 1:18cv51, 2019 WL 1005501, at *8 (M.D.N.C. Mar. 1, 2019) (affirming
ALJ rejection of Santagati opinion); Mitchell v. Berryhill, No. 17 C 6241, 2019 WL 426149, at
*9 (N.D. Ill. Feb. 4, 2019) (same); Treadaway v. Berryhill, No. 4:17-cv-1093, 2018 WL
3862106, at *5-6 (S.D. Tex. Aug. 13, 2018) (same); Richardson v. Berryhill, No. 17-0657, 2018
WL 3750978, at *4 (W.D. La. July 23, 2018) (remanding case where ALJ and Appeals Council
neglected to both address claimant's objection to VE testimony and resolve conflict between that
testimony and Santagati opinion), report & recommendation adopted by, 2018 WL 3749414
(W.D. La. Aug. 7, 2018); Kidd v. Berryhill, No. 5:17-cv-420-REW, 2018 WL 3040894, at *11
(E.D. Ky. June 19, 2018) (affirming ALJ rejection of Santagati opinion); Lara v. Berryhill, No.
B-17-77, 2017 WL 7790109, at *9 (S.D. Tex. Dec. 4, 2017) (same), report & recommendation
adopted by, 2018 WL 1027764 (S.D. Tex. Feb. 21, 2018).

The Santagati opinion, which was exhibit F to the post-hearing memorandum, relates to Crowe's sixth objection to VE Takki's testimony.  (AR 332-34, 365-66).  In his decision, the ALJ listed Crowe's post-hearing objections prior to explaining in detail his specific reasons for overruling them.  See (AR 29-31).  The list of exhibits attached to the decision identifies the entire post-hearing memorandum, which includes the Santagati opinion, as being moved into evidence at Exhibit B19E.  (AR 35).  There is no reason to think that the ALJ did not review and assess all the evidence, including the Santagati opinion, that accompanied each of the objections that he overruled.

That the ALJ did not reference the Santagati opinion by name does not persuade this Court otherwise.  First, an ALJ need not exhaustively catalog every discrete component of the decisional process provided his conclusion is supported by substantial evidence.  Johnson v. Colvin, 204 F. Supp. 3d 396, 410 (D. Mass. 2016).  In addition, the generic Santagati opinion presents, at best, evidence which conflicts with VE Takki's testimony, and evaluating conflicting opinions of two vocational experts "lies well within the competence" of an ALJ to evaluate.  See McCaffrey v. Colvin, 978 F. Supp. 2d 88, 92 (D. Mass. 2013).  Indeed, the ALJ's resolution of evidentiary conflicts must be upheld if supported by substantial evidence, even if the record arguably could justify a different conclusion.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Pires v. Astrue, 553 F. Supp. 2d 15, 21 (D. Mass. 2008).

The ALJ's step five findings here are supported by substantial evidence.  He found that VE Takki described the characteristics of the jobs as "expressly consistent" with the DOT and SCO "(and as to which the record offers no contradiction), and also consistent with the experience and expertise of the vocational expert."  (AR 30).  The ALJ also found that "[n]o apparent conflicts existed between the occupational evidence provided by the vocational expert

and occupation information in the" DOT.  (AR 31).  Indeed, for each of the jobs that VE Takki

proposed, the DOT entries list the necessary social requirements (i.e., taking instructions and

helping people) as "non-significant."  See DICOT 209.587-034, 1991 WL 671802 (marker);

DICOT 323.687-014, 1991 WL 672783 (cleaner); DICOT 729.684-054, 1991 WL 679729

(subassembler).  Nothing in the job descriptions mandates more than superficial interaction with

co-workers and supervisors.  See id.  Accordingly, the ALJ here did consider and resolve

Crowe's post-hearing objections.  No reversible error exists on this basis.

IV.    ORDER

    For the foregoing reasons, this Court grants the Commissioner's motion to affirm and

denies Crowe's motion for an order reversing the Commissioner.


                                       /s/ Jennifer C. Boal
                                       JENNIFER C. BOAL
                                       United States Magistrate Judge